UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 2:14-cr-63 |
| | ) | |
| GEORGE GASICH and | ) | |
| BARBARA GASICH, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

George and Barbara Gasich, representing themselves, have filed a second "notice" to the court that they have withdrawn their guilty pleas, primarily on grounds that the pleas were entered under duress and coercion from standby counsel, the government, and the court—so much coercion that it was "in the nature of criminal extortion amounting to the psychological rape of the mind[,] will[,] and emotions of the Gasiches, just like the rape of a 5 year old child."(DE 178 at 2.) I construed the notice as a renewed motion to withdraw their guilty pleas. (DE 182.) In support of their renewed motion, the Gasiches offered written reports and live testimony from a psychiatrist who found them to be suffering from "mental symptoms that impaired [their] judgment" when they pleaded guilty. (DE 179 at 1; *see also generally* DE 227.) Notwithstanding the new evidence the Gasiches have presented, I remain convinced that the Gasiches fully understood the implications of their guilty pleas and entered them voluntarily.

1

## Background

On October 21, 2015, Barbara Gasich pleaded guilty to count 1 of the indictment, which charged her with making and presenting a claim for payment of a fraudulent tax refund in the amount of $28,634, knowing that the claim was false. (DE 91.) The same day, George Gasich pleaded guilty to count 2 of the indictment, which charged him with making and presenting a claim for payment of a fraudulent tax refund in the amount of $447,538, knowing that the claim was false, fictitious, and fraudulent. (DE 92.) The indictment included five other counts, but the government indicated that it did not intend to pursue them, so those counts were held in abeyance. (DE 1; DE 102.)

My order denying the Gasiches' first motion to withdraw their pleas recounts in detail the lengthy exchange I had with the defendants prior to accepting their guilty pleas. (*See* DE 170 at 2–9; *see also id.* at 11–16.) The short version is that I discussed with each defendant the rights that would be waived by pleading guilty and the other consequences, and I satisfied myself that they fully understood. (*See generally* DE 105; DE 104.) I also took steps to ensure that the Gasiches were acting voluntarily and that there was a factual basis for their pleas. (*Id.*) The Gasiches had represented themselves throughout the lengthy proceedings leading up to that point—despite strong admonishments from me and Magistrate Judge Martin that doing so was a perilous course. But just prior to the plea hearing, they requested that counsel be appointed to them, and I granted that request. (*See* DE 90.)

*The Renewed Motion to Withdraw the Pleas*

On March 22, 2016, five months after they pleaded guilty, the Gasiches filed an Amended Notice of Withdrawal of Plea Pursuant to FRCP Rule 11. (DE 178.) By that point in time, the Gasisches had discharged their lawyers and were again representing themselves. In support of the notice, the Gasiches filed reports written by Dr. Stuart Burstein, a psychiatrist who examined the Gasiches in March 2015 and concluded "with a reasonable degree of medical or psychiatric certainty" that the Gasiches "were suffering from emotional duress when [they] signed a guilty plea in 2015." (DE 179 at 1.) Dr. Burstein opined that Mrs. Gasich "has been and is suffering from severe anxiety and depression [that] were impairing her mental function when she was asked to agree to plead guilty on October 21, 2015" and that Mr. Gasich's "depressed mood with feelings of guilt or worthlessness prevented his standing up for his rights or appreciating the damage he was doing to himself." (*Id.* at 3, 6.) Nevertheless, Dr. Burstein described both defendants' thought processes as "[g]oal-directed" and their cognition, language, memory, judgment, and concentration/attention as "[i]ntact." (*Id.*)

On May 18, 2016, I held a hearing on the renewed motion so that the Gasiches could present testimony from their psychiatrist in support of the motion. (*See* DE 216; DE 227.) Dr. Burstein testified that there can be "unconscious impairment of volition that comes from symptoms of depression or anxiety" and that anxiety can "lead to excessive worry and fearfulness, which contributes to misunderstanding of phenomenon occurring around the person or . . . messages and statements given to the

individual[.]" (DE 227 at 18:7–19.) He further testified that the cumulative effect of stress from distinct events can compromise one's volition and that "the degree of the symptomatic problem" can be measured using a tool called the Global Assessment of Mental Functioning ("GAF"). (*Id.* at 21:10–22:11.) Dr. Burstein stated that the GAF consists of a 100-point scale, with scores above 70 being considered in the normal range. (*Id.* at 22:11–14.) By Dr. Burstein's estimation, Mr. Gasich had a GAF score of 64, and Mrs. Gasich, a score of 56. (DE 179 at 3, 7.) When asked if he thought the Gasiches were under an "irresistible impulse to respond verbally just to relieve stress of the moment" when they pleaded guilty, he testified that there "was an impulse to relieve stress and distress at the moment" and "apprehension and fearfulness" resulting from a number of events. (DE 227 at 23:7–21). On cross-examination, Dr. Burstein admitted that his reports relied "almost exclusively" on the Gasiches' statements to him, which were not made under oath. (*Id.* at 36:5–15.)

At the conclusion of the evidentiary hearing, I gave the parties the opportunity to file additional briefing on the motion to withdraw. Neither party submitted additional briefing, so the matter is now ripe for disposition.

## Discussion

The Gasiches offer a number of grounds upon which they think they are entitled to withdraw their pleas, some old and some new. Their primary argument is a rekindled one, that the plea hearings were "an exercise in an extreme manner of threat, duress and coercion[.]" (DE 178 at 2; *see also, e.g.,* DE 133 ¶ 19; DE 134 ¶ 19; DE 144 at

4

25:8–26:9; DE 151 at 4.) What's marginally different about the Gasiches' argument this time around is their claim that anxiety and depression rendered them unable to resist the pressure to plead guilty.

Federal Rule of Criminal Procedure 11 and principles of due process "require that a defendant's guilty plea be voluntary (i.e., not induced by threats or promises of any kind) and knowingly made." *United States v. Ranum*, 96 F.3d 1020, 1024 (7th Cir. 1996) (citations omitted). That means that the defendant "must understand the elements of the crime to which he is pleading, as a guilty plea is an admission of all the elements of the crime charged." *Id.* Rule 11(d)(2)(B) states that a defendant "may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." A fair and just reason for withdrawing a plea includes where a plea was not entered knowingly and voluntarily. *See United States v. Graf*, No. 15-2260, 2016 WL 3513460, at *2 (7th Cir. June 27, 2016); *United States v. Fard*, 775 F.3d 939, 943 (7th Cir. 2015).

To assess the validity of a Rule 11 plea colloquy, a court should consider "the totality of the circumstances," including: "the complexity of the charge, the defendant's level of intelligence, age and education, whether the defendant was represented by counsel, the judge's inquiry during the plea hearing and the defendant's statements, as well as evidence proffered by the government." *United States v. Loutos*, 383 F.3d 615, 619 (7th Cir. 2004) (internal quotation marks and citation omitted). The totality of the circumstances here leads me to conclude (for the second time) that the Gasiches pleaded

5

guilty knowingly and voluntarily of their own free will. To begin with, they are not typical defendants. They are long-time business owners with college degrees and, as their psychiatrist noted, above-average intelligence, and the counts to which they pleaded guilty were not complex. In addition, at the plea hearings I carefully explained the elements that the government would have to prove if the case were to proceed to trial. (*See* DE 105 at 18:23–19:16; DE 104 at 11:2–18.) Afterwards, I asked both defendants if they understood, and neither equivocated when answering "Yes." (*Id.*) Finally, the government stated at the plea hearings that it was prepared to proffer evidence that Mrs. Gasich created fraudulent tax forms that the Gasiches then filed with their 2007 federal taxes in order to receive a tax refund of $28,634 that could be used to offset a tax liability. (DE 105 24:8–27:18; DE 104 13:9–23.) Both defendants heard the government describe that evidence and agreed with the government's version of events. (DE 105 at 25:15–18, 27:20–23; DE 104 at 14:2–7.)

Additionally, I was very careful to confirm that the Gasiches were pleading guilty voluntarily. Before I accepted Mrs. Gasich's plea, I asked whether anyone had promised her anything in an effort to convince her to plead guilty, and she said no one had. (DE 105 at 5:21–6:16.) I made sure to clarify that the government's stated intention not to pursue counts 3–7 of the indictment *was not* binding and that the government could decide to pursue those counts, and Mrs. Gasich testified that she understood. (*Id.* at 5:25–6:7.) I also asked Mrs. Gasich whether her lawyer, the government lawyer, or anyone else had tried to force her or coerce her into pleading guilty. (*Id.* at 7 at 2–4.) In

6

response, she asked me what "force" means, and I clarified that I wanted to be sure that no one had threatened her to get her to plead guilty and that she was pleading guilty of her own free will because she is, in fact, guilty. (*Id.* at 7:5–16.) She replied, "[t]hat's what I'm saying today, yeah." (*Id.* at 7:16.) Mr. Gasich was present at his wife's plea colloquy, and I had a similar exchange with him. Like his wife, he testified that he was pleading guilty voluntarily and because he was actually guilty, not because he had been promised something or forced or coerced into doing so. (DE 104 at 4:18–6:14.)

These sworn statements by the Gasiches are entitled to a "presumption of verity." *Loutos*, 383 F.3d at 619 (internal quotation marks and citation omitted); *United States v. Pike*, 211 F.3d 385, 390 (7th Cir. 2000) (stating it is "an uphill battle" to withdraw a guilty plea after the defendant has convinced a judge to accept it) (internal quotation marks and citation omitted). As the Seventh Circuit noted just last month, the "plea of guilty is a formal and solemn step, where the defendant admits his guilt under oath after assuring the court, also under oath, that he is ready, willing, and able to make that decision after consulting sufficiently with his lawyer and being informed about all matters that he needs to know about to make the decision." *Graf,* 2016 WL 3513460, at *2. Indeed, "[t]he whole point of the plea proceeding (the Rule 11 colloquy) is to establish that the plea was knowingly and voluntarily made." *Politte v. United States*, 852 F.2d 924, 931 (7th Cir. 1988) (internal quotation marks and citations omitted).

Furthermore, I remember the Gasiches' Rule 11 hearings well, and the defendants' testimony, including their demeanor and tone, convinced me that they

7

were testifying truthfully. The Gasiches pleaded guilty on the Wednesday before their Monday trial date—a date that I made clear to them was firm. As I noted above, prior to the entry of their pleas of guilty, the Gasiches steadfastly insisted on representing themselves despite repeated warnings from me and Magistrate Judge Martin of the dangers of that path. In the process, the Gasiches stalled these proceedings for more than a year with an onslaught of frivolous filings. Obviously, seeing that they were running out of options and facing the certainty of a trial in a few days, it was time to fish or cut bait. At a status hearing five days before trial, the Gasiches did an about-face and requested that counsel be appointed to them for the purpose of entering guilty pleas. (*See* DE 90; *see also* DE 88.) I granted their request and appointed the lawyers who were previously assigned to them as standby counsel. (*See* DE 90.)

The defendants appeared alert and oriented at the Rule 11 hearing—just like they were at the evidentiary hearing on the renewed motion to withdraw their pleas. They were thoroughly engaged and requested clarification from me and their attorneys on several occasions. (*See, e.g.*, DE 105 at 7:5–16 (Mrs. Gasich, asking me to "elaborate what 'force' means"); DE 104 at 4:17 (Mr. Gasich, stating, "I'm not quite sure what you're asking")*; id.* at 5:19 (Mr. Gasich, stating, "I'm not quite sure about that")*; id.* at 8:10–13 (Mr. Gasich, asking whether they would "have the opportunity to just give . . . the portion of the story that [the court is ] not familiar with"); *see also* DE 105 at 14:17–18 (off the record conversation between Mrs. Gasich and her counsel); DE 104 at 9:6–7 (off the record conversation between Mr. Gasich and his counsel).) In short, I have no doubt

that the Gasiches were comfortable bringing issues to my attention and that, if they had been coerced into pleading, it would have come out then.

Nor do Dr. Burstein's reports or his testimony suggest otherwise. It is true that he diagnosed Mrs. Gasich with major depression and Mr. Gasich with post-traumatic stress disorder and concluded that they were suffering from "apprehension and fearfulness" and had "an impulse to relieve stress and distress" when they pleaded guilty. (DE 227 at 23:15–21.) But he also found their thought-processes to be "[g]oal-directed" and their cognition, language, memory, judgment, and concentration/ attention to be "[i]ntact," (DE 179 at 3, 6), which is consistent with my impressions during the Rule 11 hearings and with the Gasiches' sworn testimony on that day that they were clear-headed. (*See* DE 105 at 3:23–24; DE 104 at 3:18–19.)

In addition, Dr. Burstein's assessment of the Gasiches using the Global Assessment of Functioning does not support his claim that their mental conditions seriously impaired their judgment and willpower. The GAF is a psychiatric test used to assess "functioning during a specified period, on a continuum from mental health (score 100) to mental illness (score 0)." Liza H. Gold, *DSM-5 & the Assess. of Functioning: The WHO Disability Assess. Sch. 2.0 (WHODAS 2.0)*, 42 J. Am. Acad. Psychiatry & L. 173, 173–74 (2014), *available at* www.jaapl.org/content/42/2/173.full (last visited July 8, 2016). Recently, "[t]he American Psychiatric Association . . . eliminated the GAF scale from its Diagnostic and Statistical Manual of Mental Disorders as being unreliable." *See Voigt v. Colvin*, 781 F.3d 871, 874–5 (7th Cir. 2015). Nevertheless, Dr. Burstein used it and

assigned Mrs. Gasich a score of 56 and Mr. Gasich, 64.

Even if the GAF were still considered reliable, these scores would not suggest that the Gasiches were as impaired by their psychiatric conditions as Dr. Burstein claims. Mrs. Gasich's score of 56 would indicate only "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning[,]" not "serious symptoms and severe difficulty with her current activities[,]"as Dr. Burstein described. *Compare Diag. & Stat. Manual of Mental Disorders (DSM-IV-TR)*, 34 (4th ed. text rev. 2000), *with* DE 179 at 7. Similarly, Mr. Gasich's score of 64 would indicate "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning. . . *but generally functioning pretty well*[,]" whereas Dr. Burstein described the score as indicating "noteworthy symptoms of anxiety and depression." *Compare DSM-IV-TR* at 34 (emphasis added), *with* DE 179 at 3. "Serious" symptoms and impairments like the ones the Gasiches say they suffer from are referred to only when GAF scores dip to 50 or below, and difficulties in communication, judgment, and thinking appear only once a score is at 40 or below. *See DSM-IV TR* at 34.

With that said, I don't mean to suggest that the Gasiches have not experienced stress and anxiety emanating from the charges in this case. I have no reason to disagree with Dr. Burstein's conclusion that they suffer from depression, PTSD, and/or anxiety. But it should go without saying that nearly every defendant facing the prospects of a criminal trial is likely to feel stress and anxiety. The real question is whether a defendant's mental state was so deteriorated that his decision to plead guilty cannot be

considered voluntary. In this case, I simply can't square the doctor's claim that the Gasiches' psychological conditions made them unable to resist pressure to plead guilty with significant conflicting evidence that they pleaded guilty voluntarily. That evidence includes a report and testimony by Dr. Burstein himself, which indicated that the Gasiches are intelligent folks with goal-directed thinking and good judgment. It also includes what I saw with my own eyes during the Gasiches' Rule 11 colloquies and what I have observed before and after their plea hearings.

For all of these reasons, I do not believe that the Gasiches were so affected by depression, stress, and/or anxiety that they involuntarily pleaded guilty. The totality of the circumstances indicates that they pleaded guilty of their own free will.

### *Timing of the Guilty Pleas*

The Gasiches also suggest that it was procedurally improper to accept their guilty pleas on the day they were offered and prior to the filing of the final presentence investigative reports. (DE 178 at 2.) They claim that Rule 11(d)(1) entitles them to a period of time between their decision to plead guilty and my acceptance of the pleas and that "the accepted general practice is to withhold accepting the plea of the defendant until the PSR Report is finished and a hearing is held to satisfy Rule 11(d)(1)." (*Id.*) The Gasiches misunderstand the law. Rule 11(d)(1) governs when a defendant may *withdraw* a guilty plea, not when a court may *accept* one. Acceptance of guilty pleas is governed by Rule 11(b), which permits a court to accept a guilty plea, so long as the court has (1) informed the defendant of certain rights and consequences and

confirmed the defendant's understanding, (2) ensured that the plea is voluntary and not the result of force, threats, or promises, and (3) determined that there is a factual basis for the plea. Courts have the *discretion* to withhold acceptance of a guilty plea until after the presentence report is finalized, but neither Rule 11 nor any other rule *requires* a court to wait. For this reason, there was nothing improper about accepting the Gasiches' pleas when I did.

*Actual Innocence*

The renewed motion also half-heartedly argues that the Gasiches should be permitted to withdraw their pleas because they are actually innocent since there was not a "knowledgeable voluntary signature" on the documents the Gasiches filed with their taxes. However, the Gasiches' state of mind when they signed the tax documents is beside the point. If the Gasiches were to go to trial, the only *mens rea* the government would to prove is that the Gasiches knew the tax forms were false when they submitted them to the IRS. Both defendants testified under oath that they knew the forms were false when they filed them and that they were pleading guilty because they are "in fact, guilty." (DE 105 at 7:12–16, 25:22–26:11; DE 104 at 6:12–14, 12:8–25.) Nothing in the renewed motion or supporting evidence contradicts this earlier testimony or otherwise leads me to believe that their admissions of guilt were not true.

*Ineffective Counsel*

Finally, the Gasiches assert that they should be permitted to withdraw their pleas because they had ineffective counsel who failed to consider or discuss a laundry list of

topics. (*See* DE 178 at 4–6.) Ineffective assistance of counsel can be a valid ground for withdrawing a guilty plea. *United States v. Carroll,* 412 F.3d 787, 793 (7th Cir. 2005). To establish ineffective assistance, a defendant must show that (a) the attorney's representation was "objectively unreasonable" and (b) the defendant would not have pleaded guilty "but for" the attorney's mistakes. *Id.* The test is very deferential, so deferential in fact that:

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]

*Strickland v. Washington*, 466 U.S. 668, 689 (1984).

The Gasiches provide 26 "examples" of their counsel's ineffectiveness, but their arguments are barebones at best. (*See* DE 178 at 3–6.) Several examples are so poorly articulated that I'm not sure what it is the Gasiches are trying to say or how they think their attorneys conduct fell short. (*See id.* at 4, 6 (Item Nos. 5, 16, 17, 22, 23, 24, 25, 26).) For example, the renewed motion states that the Gasiches' attorneys were ineffective because they "said the defects could be raised on appeal[,]" but it's unclear what "defects" the Gasiches are talking about, so there's no way to assess whether counsel's conduct was reasonable. (*See id.* at 5 (Item No. 15).) But even the better articulated examples don't make the grade, because the Gasiches have not shown (or even tried to show) that their attorneys' conduct was objectively unreasonable or that, but for the

13

failure to discuss these matters, the Gasiches would not have pleaded guilty. (*See id.* (Item Nos. 12, 14, 18).)

On top of this fatal shortfall, many issues the Gasiches say their attorneys ignored are ones that were raised and rejected in the months preceding the change of plea hearings. (*Compare e.g.*, DE 178 at 3–5 (jurisdictional arguments in Item Nos. 1–3, 6–10, *with* DE 154, *and* DE 229; *compare also* DE 178 at 4, 6 (arguments re exculpatory evidence, statute of limitations, and tolling agreement in Item Nos. 4, 19–20), *with* DE 170 at 16–20.) Under such circumstances, it was not objectively unreasonable for the Gasiches' counsel to skip further discussion.

Similarly, several issues the Gasiches say should have been discussed were covered in some fashion during the plea colloquies—which suggests that the Gasiches would have pleaded guilty even if their attorneys had separately raised these issues. For example, while counsel may not have explained "all the relevant material elements of the offense, the indictment, and the plea[,]" the plea hearings adequately addressed these matters. (*See* DE 178 at 6 (Item No. 21); *see also, e.g.*, DE 105 at 18:23–19:16; DE 104 at 11:2–15).) In addition, the Gasiches' attorneys may not have told them that by pleading guilty they'd be "waiving all defects in the government's case" and "adjudging themselves guilty," but I did—by explaining to them that they would be waiving their trial rights, including the right to force the government to prove its case. (*See* DE 178 at 5 (Items No. 11, 13); DE 105 at 16:12–17:2; DE 104 at 9:16–10:7.)

For all of these reasons, the Gasiches have not shown that their attorneys'

conduct was objectively unreasonable or that, but for their attorneys' purported failure to address the listed issues, the Gasiches would not have pleaded guilty. As a result, they are not entitled to withdraw their pleas on the basis of ineffective assistance of counsel.

## Conclusion

Accordingly, George and Barbara Gasich's renewed motion to withdraw their guilty pleas (DE 178) is **DENIED**. George Gasich's sentencing hearing is **SET** for **August 9, 2016, at 10:00 a.m. Central/Hammond Time**, and Barbara Gasich's sentencing hearing is set for **August 9, 2016, at 10:30 a.m. Central/Hammond Time**. The Gasiches are **DIRECTED** to provide any outstanding financial information to **the U.S. Probation office no later than July 21, 2016**.

**SO ORDERED.**

ENTERED: July 11, 2016.

                                            s/ Philip P. Simon
                                            CHIEF JUDGE
                                            UNITED STATES DISTRICT COURT